# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL FEDERATION OF FEDERAL EMPLOYEES-IAM, | |
| Plaintiff, | |
| v. | Civil Action No. 10-1735 (BAH) Judge Beryl A. Howell |
| THOMAS J. VILSACK, in his official capacity as Secretary of Agriculture, *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

In this case, a union representing federal employees challenges the constitutionality under the Fourth Amendment of a U.S. Department of Agriculture ("USDA") policy expanding random drug testing to incumbent employees who work with at-risk youth in residential Job Corps Civilian Conservation Centers ("JCCCC"). These centers are located in remote or rural areas within the National Forest System, and are operated by the U.S. Forest Service ("USFS"), an agency of the USDA. The plaintiff National Federation of Federal Employees, Federal District 1-IAM ("NFFE"), which represents certain USFS employees covered by the new policy, alleges that the random drug testing policy violates the Fourth Amendment because it is overbroad and designates employees for random drug testing who have no critical connection to safety or other compelling governmental interests. Compl. ¶ 14.

Presently before the Court is the plaintiff's Motion for a Preliminary Injunction to enjoin random drug testing of USFS employees at JCCCCs; and defendants USDA and USFS's Motion to Dismiss, or, in the alternative, for Summary Judgment. After review of the memoranda filed

in support and opposition to the parties' motions, the accompanying declarations and applicable law, for the reasons set forth below, the Court hereby DENIES defendants' motion to dismiss the Complaint, GRANTS defendants' motion for summary judgment, and DENIES plaintiff's motion for a preliminary injunction.

## I. BACKGROUND

Plaintiff is a labor union that represents approximately 15,000 U.S. Forest Service employees, including those who work at approximately nineteen Jobs Corps Centers operated by the USFS. Pl.'s Opp. to Defs' Mot. Summ. J., Ex. 1, Larry King Decl. (hereinafter "Pl.'s King Decl."), ¶¶ 2, 5; Compl. ¶ 1 (Factual Background). Jobs Corps Centers are vocational training programs administered by the Department of Labor for economically disadvantaged youth aged 16 to 24. Defs' Mot. Summ. J., Ex. 1, Larry Dawson Decl. (hereinafter "Defs' Dawson Decl."), ¶ 3. Jobs Corps Centers serve more than 60,000 students at 124 centers across the country, and are intended to offer an environment in which students "obtain the education and vocational skills necessary to become productive and employable." *Id.* at ¶¶ 3-4. The case currently before the Court does not pertain to all Job Corps Centers, but only those operated and staffed by USFS employees.

### A. Job Corps Students Generally

By statute, students admitted into Jobs Corps programs must be economically disadvantaged, and "(1) basic skills deficient; (2) a school dropout; (3) homeless, a runaway, or a foster child; (4) a parent; [or] (5) an individual who requires additional education, vocational training, or intensive counseling and related assistance, in order to participate successfully in regular schoolwork or to secure and hold employment." 29 U.S.C. § 2884. The defendants relay that many students are "from inner cities and were previously members of street gangs," that the

program is their "last chance," providing "many students with an opportunity to significantly change their lives." Defs' Dawson Decl., ¶ 4.

Jobs Corps Centers are primarily directed toward disadvantaged, at-risk, or troubled youth and enforce a strict "zero tolerance" drug policy. *Id.* at ¶ 8. Students submit to drug testing upon entering the program, and must enroll in an anti-drug program if they test positive. *Id.* Despite knowing that they will be tested, approximately 26 percent of enrolling students nonetheless test positive for drug use. *Id.* at ¶ 7. To advance the Jobs Corps' drug-free policy, Jobs Corps staff members are required to monitor students for possible drug use and conduct periodic inspections of students' personal belongings. *Id.* Such inspections have included the use of canine units (drug dogs), and involve searches of personal lockers and living spaces. *See* Defs' Mot. Summ. J., Ex. 2, Linda J. Guzik Decl. (hereinafter "Defs' Guzik Decl."), ¶¶ 8-10; Defs' Mot. Summ. J., Ex. 3, Raymond J. Ryan Decl. (hereinafter "Defs' Ryan Decl."), ¶¶ 6-7; Defs' Mot. Summ. J., Ex. 4, Cynthia S. Kopack Decl. (hereinafter "Defs' Kopack Decl."), ¶¶ 7-9. Any Jobs Corps staff member, who suspects a violation of the drug policy, can order a student to submit to further testing. Defs' Dawson Decl., ¶¶ 8-9. After two positive tests for drug use, students are dismissed from the program. *Id.*

**B. Jobs Corps Civilian Conservation Centers**

By agreement between the U.S. Department of Labor (hereinafter "DOL") and the USDA, the USFS operates twenty-eight JCCCCs. These centers educate 6,200 students and are located in remote, rural sites within the National Forest System. *Id.* at ¶¶ 3, 5; *see, e.g.,* Defs' Guzik Decl., ¶ 17 (closest trauma center to Trapper Creek JCCCC is 75 miles away); Defs' Ryan Decl., ¶ 13 (closest trauma center to Anaconda JCCCC is 97 miles away); Defs' Kopack Decl., ¶ 17 (closest trauma center to Cass JCCCC is 137 miles away); 29 U.S.C. § 2887(c)(1); 36 C.F.R.

§ 200.3(b). All JCCCCs are open 24 hours a day, seven days a week, and provide a residential program where students live and work. Defs' Dawson Decl.,¶ 6. Students at these sites are prohibited from bringing personal vehicles and therefore rely on JCCCC staff for transportation. *See id.* at ¶ 6.

The JCCCCs are staffed by USFS employees and contracted workers, some but not all of whom also reside at the centers with the students. Defs' Mot. Summ. J., Ex. 5, Larry Dawson Supplemental Decl. ("hereinafter Defs' Dawson Suppl. Decl."), ¶¶ 4, 7.The JCCCC staff are responsible for teaching, mentoring, and monitoring students admitted into the Jobs Corps program, as well as for the administrative operations of the centers. *See* Pl.'s Opp. to Defs' Mot. Summ. J., Ex. 25, Lance Hamann Supplemental Decl. (hereinafter "Pl.'s Hamann Suppl. Decl."), ¶¶ 5-13; Pl.'s Opp.to Defs' Mot. Summ. J., Exs. 9-20, 22, Job Descriptions of JCCCC Employees. JCCCC employees fill many occupational positions, including teachers, guidance counselors, training instructors, laundry machine operators, file clerks, computer assistants, purchasing agents, and cooks. *See* Pl.'s Opp. to Defs' Mot. Summ. J., Exs. 9-20, 22, Job Descriptions of JCCCC employees. No matter the position, all JCCCC staff members undergo pre-employment background investigations, which are "more rigorous" than the background checks undertaken for most other non-JCCCC USFS employees, and also undergo periodic background reinvestigations. Defs' Dawson Decl., ¶ 12; Defs' Dawson Suppl. Decl., ¶ 5. JCCCC employees are subject to the background check protocol that the USDA designed in 1993 for employees that "supervise young people." Defs' Dawson Decl., ¶ 12 (all JCCCC employees are subject to a "Child Care National Agency Check with Inquires: Non Sensitive/Low Risk," and some are subject to "Moderate Risk Background Investigation: Moderate Risk/Public Trust").

Aside from nurses and those who hold commercial driver's licenses, JCCCC employees have not previously been subject to suspicion-less drug testing during employment. Pl.'s King Decl., ¶ 16. The defendants allege that at least eight JCCCC staff members have been disciplined for drug violations in recent years. Defs' Dawson Decl., at ¶ 17.

While the positions and specific duties of each employee differ, the defendants contend that all employees are responsible for the safety of the JCCCC students. *Id.* at ¶¶ 13-16; Defs' Guzik Decl., ¶ 18; Defs' Ryan Decl., ¶ 14; Defs' Kopack Decl., ¶ 18. All employees are trained in CPR and First Aid within 90 days of employment, and applicable regulations require staff members to hold driver's licenses so that they can be available to transport students to work sites, airports, medical appointments, for personal errands, or to help evacuate the centers in cases of emergency. Pl.'s Opp. to Defs' Mot. Summ. J., Ex. 8, USDA Dep't Regulation No. 4430-792-2, Drug Free Workplace Program, Aug. 25, 2003 (hereinafter "USDA Drug Testing Regulation"), at A-7 ("*Each staff member* is required to possess a valid driver's license to transport students in case of emergency, to and from work sites, etc.") (emphasis added);[1] Defs' Guzik Decl., ¶ 16; Defs' Ryan Decl., ¶ 12; Defs' Kopack Decl., ¶ 16. Although some JCCCC employees rarely undertake such tasks, given the centers' remote locations and residential setting, all staff may be required to respond in an emergency situation and transport and care for students. Defs' Dawson Decl., ¶¶ 14-16; Defs' Guzik Decl., ¶¶ 17-19; Defs' Ryan Decl., ¶¶ 13-15; Defs' Kopack Decl., ¶¶ 17-19; *see also* Pl.'s Opp. to Defs' Mot. Summ. J., Ex. 6, Jerry D.

---

[1] In contrast to the express terms of the applicable USDA drug testing regulations issued in 2003, *see* USDA Drug Testing Regulation, at A-7 ("Each staff member is required to possess a valid driver's license"), defendants' declaration suggests that not all staff have driver's licenses. Defs' Dawson Decl., ¶ 14 ("JCCCC employees are not required to have a driver's license, [but] the large majority do . . . ."). The discrepancy between the USDA regulation and the defendants' declaration is not material. The requirement that JCCCC employees hold a driver's license is only one factor among others cited as a reason to ensure that the staff members remain drug-free.

Case Decl. (hereinafter "Pl.'s Case Decl."), ¶ 5 ("I may have provided minor First Aid to students or other staff but do not have specific recollections").

Furthermore, some employees teach students vocational skills, such as welding and electrical work, which require use of plasma cutters and welding arcs, activities that pose inherent risks to the safety of students and require a drug-free environment for both teachers and students. Defs' Guzik Decl., ¶¶ 20-22; Defs' Ryan Decl., ¶ 16; Defs' Kopack Decl., ¶ 20.

In addition to ensuring student safety, the defendants contend that all JCCCC staff members are responsible for "(1) modeling appropriate behavior for students; (2) mentoring students toward responsible behavior; and (3) monitoring student behavior, including the possibility of drug use by a student." Defs' Guzik Decl., ¶ 11; Defs' Ryan Decl., ¶ 8; Defs' Kopack Decl., ¶ 11. The defendants supply the Court with three declarations from JCCCC employees who state that at their JCCCC sites, "every federal employee . . . interacts with students on a regular basis" and engage in formal and informal mentorships with students. Defs' Guzik Decl., ¶ 12; Defs' Ryan Decl., ¶ 9; Defs' Kopack Decl., ¶ 12. Indeed, the plaintiff concedes that "all JCCCC employees are likely to interact with students from time to time based on proximity." Pl.'s Mem. Opp. to Defs' Mot. Summ. J., ECF No. 14 (hereinafter "Pl.'s Opp. Mem."), at 2-3.

Plaintiff and the defendants disagree on the extent to which each JCCCC employee is required to enforce the Jobs Corps zero tolerance drug policy. The defendants assert that every JCCCC employee is responsible for monitoring and enforcing the zero-tolerance policy, and "can report suspicious behavior and recommend a student for suspicion-based drug testing." Defs' Statement of Material Facts as to Which There is No Genuine Issue, ECF No. 11, at ¶ 10 (citing Defs' Dawson Decl. ¶¶ 7, 9; Defs' Guzik Decl., ¶ 6; Defs' Ryan Decl., ¶ 6; Defs' Kopack

Decl., ¶ 6); Pl.'s Opp. to Defs' Mot. Summ. J., Ex. 5, Michelle L. Marnhout (hereinafter "Pl.'s Marnhout Decl."), ¶ 7 (in teacher's position, "I have a general responsibility to administer the zero tolerance policy that applies to students for drugs and alcohol. When I witness a violation of the policy, I am required to fill out a referral form and an incident report."); Pl.'s Opp. to Defs' Mot. Summ. J., Ex. 3, Shawn L. Patterson Decl. (hereinafter "Pl.'s Patterson Decl."), ¶ 5 (in cook position, "I have a general responsibility to administer the zero tolerance policy that applies to students for drugs and alcohol."). The plaintiff supplied the Court with two declarations, however, from JCCCC purchasing agents, who state that they have "no responsibility for administering the zero tolerance policy." Pl.'s Case Decl., ¶¶ 1, 7 (stating that he has "no responsibility for administering the zero tolerance policy."); Pl.'s Opp. to Defs' Mot. Summ. J., Ex. 4, Lance Hamann Decl. ("hereinafter Pl.'s Hamann Decl."), ¶¶ 1, 5, 8 (stating that he has "very limited contact with students," and has "no responsibility for administering the zero tolerance policy for students."). Nevertheless, the plaintiff appears to agree with the defendants that specific duties may vary for the same designated position depending upon the staffing, circumstances and needs of a particular center. Pl.'s Opp. to Defs' Mot. Summ. J., Ex. 26, Michelle L. Marnhout Supplemental Decl. (hereinafter "Pl.'s Marnhout Suppl. Decl."), ¶ 6 ("For example, an employee at one JCCCC may occasionally volunteer to transport students while an employee in the same position at a different Center may never transport students.").

### C. JCCCC Random Drug Testing Policy

Pursuant to Executive Order No. 12,564, 51 Fed. Reg. 32,889 (Sept. 15, 1986), *reprinted in* 5 U.S.C. § 7301 note, in 1988 the USDA issued the agency's "Plan for a Drug Free Workplace," which designated some employees, but not JCCCC employees, for random drug testing. In 1995, a U.S. Senate investigation revealed drug problems at Jobs Corps Centers, and

the DOL instituted a "zero tolerance" drug program directed at ensuring that Jobs Corps Center students and staff remain drug-free. Defs' Mot. Summ. J., Ex. 6, Gerald A. Nagel Decl. (hereinafter "Defs' Nagel Decl."), ¶¶ 17-18.  The policy provided: "All staff will be held accountable for actively supporting and implementing the Jobs Corps Zero Tolerance policy. All staff must be held to the same standards of conduct described in this policy for students. Possession, distribution, and use of drugs will not be tolerated." *Id.* at ¶ 18.  Subsequently, in July 1996 the Secretary of Agriculture designated all JCCCC staff for random drug testing and these positions were added to the USDA's drug-testing regulations. *Id.*  Nonetheless, due to opposition from the NFFE, the USDA decided against implementing drug testing for JCCCC staff at that time.  *Id.* at ¶ 19.

In 2003, the USDA issued revised drug testing regulations and again included "Jobs Corps Center Staff" among those positions for which random drug testing was required. USDA Drug Testing Regulation, at app. A, sec. 14.  The USDA Drug Testing Regulation states: "Each Center staff member sees students every day, and each staff member is responsible for the safety of every student, including administering CPR and/or first aid whenever needed. Also, each staff member is required to possess a valid driver's license to transport students in cases of emergency, to and from work sites, etc." *Id.* The regulation further states: "Drug usage by Center staff members could result in the loss of students' lives or injury to the students. Also, all Center staff personnel are responsible for administering the Zero Tolerance for Drug Policy. Improper or illegal drug use is inconsistent with assisting others in becoming and remaining drug-free." *Id.*  The USDA again decided against implementing random drug testing for JCCCC employees at that time, however, due to the plaintiff's opposition.  Pl's King Decl., ¶¶ 7-8; Defs' Nagel Decl., ¶ 19.

In 2007, the Office of National Drug Control Policy instructed federal agencies to review their drug testing procedures. Defs' Nagel Decl., ¶ 19. As part of that effort, the USDA sought to revise and update its policy concerning drug testing at JCCCC centers. In May 2010, provisions mandating random drug testing of all JCCCC employees were included in the new USFS-NFFE collective bargaining agreement. *Id.* On August 30, 2010, the USDA notified JCCCC employees that the USDA was moving into compliance with the previously issued Drug Testing Regulation that designated JCCCC employees for random drug testing. Pl.'s Opp. to Defs' Mot. Summ. J., Ex. 23, Letter from Larry Dawson to Center Directors (Aug. 30, 2010). The notification stated that although JCCCC nurses and those holding commercial driver's licenses had previously been the only JCCCC employees tested, the random testing policy now applied to all employees. *Id.*; *see also* Pl.'s King Decl., ¶ 16.[2] The notification also informed employees that each employee's position description would be amended to reflect the new requirement. Pl.'s Opp. to Defs' Mot. Summ. J., Ex. 23, Letter from Larry Dawson to Center Directors (Aug. 30, 2010). While the USDA's new drug testing policy applies to all JCCCC employees, it does not however, apply to non-federal contract workers on JCCCC sites – many of whom undertake the same functions as JCCCC staff. Pl.'s King Decl., ¶¶ 13-14; Defs' Dawson Suppl. Decl., ¶¶ 9-10.

On October 13, 2010, the NFFE filed a Complaint against the USFS and the USDA, arguing that the new random drug testing regulation violates the Fourth Amendment because it is overbroad by "designating positions for random drug testing that have no direct nexus to safety

---

[2] JCCCC nurses and other employees who hold commercial driver's licenses have been subject to random drug testing under other provisions of the USDA's drug testing policy that are not at issue here and pre-date the USDA's new 2010 policy for all JCCCC staff. The plaintiff is not contesting the validity of the USDA drug testing policy that applies to JCCCC nurses and other employees who hold commercial driver's licenses. Pl.'s King Decl., ¶ 16.

or other compelling interests of the United States."[3] Compl. ¶ 20. On October 18, 2010, the plaintiff filed a motion for a preliminary injunction to enjoin implementation of the Drug Testing Regulation. ECF No. 2. The defendants agreed to stay testing for a short period pending adjudication of the plaintiff's challenge, *see* Joint Stipulation and Request for Order Regarding Schedule, ECF No. 4, but on January 1, 2011, JCCCC employees became subject to random drug testing. Pl.'s Status Report, ECF No. 8, Jan. 7, 2011. On January 28, 2011, the defendants filed a Motion to Dismiss, or, in the alternative, for Summary Judgment. ECF No. 11.[4]

For the reasons set forth below, the Court denies defendants' motion to dismiss, grants the defendants' motion for summary judgment, and denies the plaintiff's motion for a preliminary injunction.

## II. DISCUSSION

In order to prevail on its motion to enjoin the USFS's random drug testing program of JCCCC staff, the plaintiff must establish, *inter alia*, the likelihood that it will prevail on the merits, a proposition strongly contested by the defendants in their motion to dismiss for failure to state a claim or, alternatively, for summary judgment. The defendants' motions will be addressed seriatim.

### A. DEFENDANTS' MOTION TO DISMISS

---

[3] The plaintiff challenges the USDA's designation of all employees, including incumbents, for random drug testing. Compl. ¶19 (Factual Background) ("[The] random drug testing for employees . . . will affect all employees regardless of how long they have been employed by the federal government or how long they have held their positions at the Civilian Conservation Centers. [Testing] is not restricted to applicants or employees seeking promotions or transfers."). Plaintiff's Complaint does not allege that the USDA has instituted a policy of drug testing those applying for or being promoted to JCCCC staff positions, nor does the instant legal action challenge the USDA's ability to do so.

[4] Following re-assignment of the case to this Court on January 21, 2011, the parties requested that the Court approve a protracted briefing schedule on the defendants' dispositive motions; this schedule was substantially shortened after a status conference. Joint Stipulation and Request for Order Regarding Schedule, ECF No. 12, Feb. 3, 2011; Minute Order dated Feb. 14, 2011.

The defendants contend that the plaintiff's Complaint should be dismissed, "without reference to any evidentiary material," for failure to state a claim upon which relief can be granted. Defs' Mem. in Supp. Mot. Summ. J. (hereinafter "Defs' Mem."), ECF No. 11, at 10. They argue, essentially, that the plaintiff's Complaint contains only conclusory allegations about the over breadth of the challenged Drug Testing Regulation, and such allegations are insufficient to defeat the facial validity of the regulation. Defs' Reply Mem., ECF No. 15, at 2-4; FED. R. CIV. P. 12(b)(6).

The Federal Rules of Civil Procedure require a Complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief," FED. R. CIV. P. 8(a)(2), so as to "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (quotation and citation omitted); *see also Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 16 (D.C. Cir. 2008). Although detailed factual allegations are not required, the Complaint must set forth "more than an unadorned, the-defendant-unlawfully-harmed-me accusation," *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009), and may not merely state "a formulaic recitation of the elements of a cause of action." *Twombly,* 550 U.S. at 555.

"To survive a motion to dismiss, a Complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 570); *accord Atherton v. District of Columbia Office of the Mayor,* 567 F.3d 672, 681 (D.C. Cir. 2009). A complaint is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. The Court must therefore engage in a "two-pronged approach" under which the court first identifies the factual

allegations entitled to an assumption of truth and then determines "whether they plausibly give rise to an entitlement to relief." *Id.* at 1950. The court "construes the complaint liberally in the plaintiff's favor." *City of Harper Woods Emps.' Ret. Sys. v. Olver*, 589 F.3d 1292, 1298 (D.C. Cir. 2009). The plaintiff must nevertheless demonstrate more than the "sheer possibility that a defendant acted unlawfully." *Iqbal,* 129 S.Ct. at 1949. The Court must engage in a "common sense," "context-specific" examination of the pleading to determine whether a Complaint states a plausible claim for relief. *Id.* at 1950; *see also Twombly*, 550 U.S. at 557, 570.

The defendants argue that, given the statutory and regulatory requirements of the Job Corps Program, "inclusion of all JCCCC employees in random testing is fully consistent with the Fourth Amendment." Defs' Mem., at 10. According to defendants, "drug use among JCCCC employees would defeat the very goals of the Job Corps," to help "at-risk, economically disadvantaged youth and young adults, who must undergo drug testing to enter the program," and adhere to a stringently enforced "zero tolerance policy regarding drug use." *Id*. at 10-11.

Plaintiff's allegations in support of its challenge to the breadth in application of the drug testing policy are sufficient, however, to withstand a motion to dismiss. In particular, the plaintiff alleges that application of the USDA's drug testing regulations to all JCCCC employees, regardless of their specific duties, will cover positions such as "Purchasing Agents, Laundry Machine Operators, File Clerks, Administrative Officers, Cooks, Guidance Counselors, Teachers, Maintenance Workers, Computer Assistants and Supply Technicians." Compl. ¶ 17 (Factual Background). Many of the JCCCC employees do not have the same type of positions that are already subject to random drug testing under USDA regulations due to obvious safety concerns, such as JCCCC employees serving as nurses or holders of Commercial Drivers Licenses, or USDA employees in positions such as aircraft mechanic, aircraft or boat operator,

employees authorized to carry firearms or those directly involved in drug interdiction duties. *Id.* at ¶¶ 10, 12 (Factual Background). By contrast to the positions already covered by the random drug testing regulation, many of the JCCCC employees are in positions that have no "direct nexus to safety or other compelling interest of the United States." *Id.* at ¶ 20 (Factual Background). Consequently, plaintiff asserts that if subject to compelled drug testing and urinalysis, they would face "irreparable harm due to the invasion of their privacy." *Id.* at ¶ 21 (Factual Background).

The plaintiff's Complaint alleges a plausible claim that the regulations are overbroad, supported by sufficient factual assertions that many JCCCC employees are not in safety-sensitive positions similar in type to those already subject to the random drug testing regulation. For this reason, the defendants' motion for dismissal of the Complaint for failure to state a claim is denied.

## B. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, the Court will grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). When evaluating a motion for summary judgment, the Court draws all justified inferences in the nonmoving party's favor and accepts the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. To survive such a motion, the nonmoving party must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. The nonmoving party may not rely solely on conclusory statements or allegations, but must present specific facts that would enable a

reasonable jury to find in its favor.[5]  *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).   If

the evidence "is merely colorable, or is not significantly probative, summary judgment may be

granted."  *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

### 1.  The Fourth Amendment Constitutionality of Drug Testing Regimes

The Fourth Amendment protects citizens against unwarranted government searches and

seizures. U.S. CONST. amend. IV. These protections do not dissolve, nor are they less important,

when the government acts in its capacity as an employer.  *O'Connor v. Ortega,* 480 U.S. 709,

714-15 (1987) (plurality opinion).  Courts have long held that when the government compels its

employees to submit to urinalysis by imposing drug testing, such testing constitutes a Fourth

Amendment search.  *See, e.g., Nat'l Treasury Emps. Union v. Von Raab,* 489 U.S. 656, 665

(1989); *Skinner v. Ry. Labor Exec.'s Ass'n.,* 489 U.S. 602, 617-18 (1989); *Harmon v.*

*Thornburgh*, 878 F.2d 484, 487 (D.C. Cir. 1989); *Nat'l Fed'n of Fed. Emps. v. Cheney*, 884 F.2d

603, 608 (D.C. Cir. 1989).

The "ultimate measure of the constitutionality of a government search is

'reasonableness.'" *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652 (1995).  In the context of

---

[5] Defendants complain that the plaintiff failed to file a separate statement of issues in dispute or controvert many of the facts in defendants' motion, which must therefore be taken as admitted. Defs' Reply Mem., ECF No. 15, at 1, 5. Indeed, in setting the parties' briefing schedule the Court expressly reminded the parties "to ensure compliance with Local Rule 7(h) when filing their briefs" in support or opposition to defendants' motion for summary judgment. Minute Order dated Feb. 14, 2011.  Local Rule 7(h)(1) provides, in pertinent part: "*An opposition to such a [summary judgment] motion shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement.... In determining a motion for summary judgment, the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.*" (emphasis added).  Despite the Court's reminder, the plaintiff failed to file a separate statement of genuine issues with its opposition to the defendants' motion, but instead appears to have incorporated a "Statement of Disputed Facts" in its opposition brief.  Pl.'s Opp. Mem., ECF No. 14, at 2-5. While this is not strictly in compliance with the local rules, the factual disputes noted by the plaintiff in that section of its brief are fairly insignificant and, in any event, not sufficiently material to bar summary judgment.  *See, e.g.,* defendants allege "all JCCCC employees" have regular contact and interaction with students, while plaintiff contends that "at least some employees" have only limited contact. Pl.'s Opp. Mem., at 2.

the Fourth Amendment, a search's reasonableness is evaluated by "balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Id.* at 652-53. Although Fourth Amendment searches generally must be supported by probable cause, individualized suspicion of government employees is not necessary when the government demonstrates that random testing serves special needs, beyond the normal need for law enforcement. *Von Raab*, 489 U.S. at 665-66. This is particularly true when the government seeks to detect drug use before it occurs in order to prevent dangerous conditions or testing is otherwise justified by a compelling interest. *See id.* at 668 ("Our precedents have settled that, in certain limited circumstances, the Government's need to discover such latent or hidden conditions, or to prevent their development, is sufficiently compelling to justify the intrusion on privacy entailed by conducting such searches without any measure of individualized suspicion."). To institute testing, the government need not demonstrate "that a documented drug problem exist within the particular workplace." *Harmon,* 878 F.2d at 487. Rather, "[u]nder the balancing test applied in [Supreme Court cases] *Skinner* and *Von Raab*, a drug test in the employment context is 'reasonable' and therefore constitutional if, in light of all surrounding circumstances, the governmental interest it serves outweighs the intrusion on individual privacy interests it occasions." *Hartness v. Bush,* 919 F.2d 170, 177 (D.C. Cir. 1990).

Although the government must pass a high-bar to justify random drug testing in light of an individual's privacy interests, courts have recognized that in certain situations, suspicion-less random testing of federal employees is appropriate. Courts have upheld testing as it pertains to employees involved in drug interdiction, *Von Raab*, 489 U.S. at 679; railway workers involved in accidents, *Skinner*, 489 U.S. at 633-34; drug counselors, *Cheney*, 884 F.2d at 614; and, outside the employment context, even for student athletes, *Vernonia*, 515 U.S. at 664-65. That said, the

Supreme Court has "caution[ed] against the assumption that suspicionless drug testing will readily pass constitutional muster. . . ." *Vernonia,* 515 U.S. at 665.

In the case before the Court, the plaintiff contends that the USFS's new drug testing policy designating all JCCCC employees for random testing is unreasonably overbroad, since it would require testing of employees who have "no direct nexus to safety or other compelling interests of the United States." Compl. ¶ 20. The legitimate expectation of privacy for these employees, plaintiff argues, is not outweighed by a governmental interest and, therefore, the Court should hold that the testing policy violates the Fourth Amendment. The Court believes, however, that given the goals of the JCCCC program, the nature of JCCCC employees' responsibilities and the context in which they work, these employees have a diminished expectation of privacy, and this privacy interest is overridden by the government's interest in preventing illegal drug use at JCCCCs by both students and staff.

## 2. The JCCCC Employees' Reasonable Expectation of Privacy

The Fourth Amendment protects privacy interests that society recognizes as legitimate. *Vernonia*, 515 U.S. at 654. "What expectations are legitimate varies, of course, with context, depending, for example, upon whether the individual asserting the privacy interest is at home, at work, in a car, or in a public park." *Id.* (internal citation omitted). With regard to the privacy expectation of employees, such expectations may be diminished by the "'operational realities of the workplace' [and] may render entirely reasonable certain work-related intrusions by supervisors and co-workers that might be viewed as unreasonable in other contexts." *Von Raab*, 489 U.S. at 671. Although there is not a specific standard by which the Court evaluates an individual's reasonable expectation of privacy, factors relevant to this consideration include: (1) the intrusiveness of the drug testing scheme, and (2) the degree to which the class of employees

designated for testing have previously been regulated. *See Chandler v. Miller*, 520 U.S. 305, 314-315 (1997); *Cheney*, 884 F.2d at 608 (treating as separate factors the intrusiveness of the imposed drug testing regime and the extent to which employees were previously regulated); *Knox Cnty. Educ. Ass'n v. Knox Cnty. Bd. of Educ.*, 158 F.3d 361, 379 (6th Cir. 1998); *see generally Skinner,* 489 U.S. at 626-27.

a.    *Intrusiveness of the USFS Random Drug Testing Regime*

Drug testing requires an individual to provide a sample of urine, which is then tested for the presence of certain narcotics. *See* Pl.'s Opp. to Defs' Mot. Summ. J., Ex. 21, USDA, Plan for a Drug Free Workplace.  Compelled urine testing involves two separate Fourth Amendment searches, the first when the urine is collected, and the second when the urine is analyzed because such analysis "can reveal a host of private medical facts about an employee." *Skinner*, 489 U.S. at 617; *Willner v. Thornburgh*, 928 F.2d 1185, 1189 (D.C. Cir. 1991).  JCCCC drug testing is governed by the U.S. Department of Health and Human Services' ("HHS") "Mandatory Guidelines for Federal Workplace Drug Testing Programs," 73 Fed. Reg. 71,858 (2008).  Defs' Nagel Decl., ¶ 3.  Courts have held that testing regimes implemented in accordance with previous iterations of the HHS Guidelines are minimally intrusive.  *See Von Raab,* 489 U.S. at 672 n.2; *Stigile v. Clinton*, 110 F.3d 801, 804 (D.C. Cir. 1997) ("The HHS regulations that govern the EOP's testing minimize the intrusion into [an individual's privacy] interest," citing *Von Raab*, 489 U.S. at 672 n.2).  The testing procedures at issue here are virtually identical to the regulations previous courts have considered, and this Court similarly finds that the HHS Guidelines in place for JCCCC testing minimizes intrusions of an employee's privacy interest.[6]

---

[6] The plaintiff does not argue that the USDA's testing procedures are overly intrusive, but rather argues that the Court should place "little emphasis" on the testing methods because even minimally intrusive testing regimes have previously been struck down by the Court. Pl.'s Opp. Mem., at 18-19 (citing *Chandler*, 520 U.S. at 312).  As noted above, the intrusiveness of a drug-testing regime is but one factor in evaluating the constitutionality of the USDA's

17

In *Von Raab*, the Court assessed the then-applicable HHS Mandatory Guidelines, which governed procedures for collection and analysis of urine. *Von Raab*, 489 U.S. at 672 n.2. These guidelines mandated that employees should be given a private stall in which to provide the urine sample, and should not be directly observed when doing so. *Id.* Further, the guidelines stated that the sample would only be tested for the specified drugs at issue, and would not be used to obtain other medical information. *Id.* The Court found that "[t]aken together, these procedures significantly minimize the intrusiveness of the [defendant's] drug-screening program." *Id.* Likewise, in 1997, the D.C. Circuit was presented with another case challenging a government drug testing regime, which also comported with then-applicable HHS guidelines. *Stigile*, 110 F.3d at 804. Citing *Von Raab*, the D.C. Circuit concluded that HHS drug testing regulations "minimize the intrusion into [one's privacy] interest." *Id.*

As in *Von Raab* and *Stigile*, the procedure for collecting urine samples from JCCCC employees in this case is governed by the HHS Mandatory Guidelines for Federal Workplace Drug Testing Programs, albeit a modified version.[7] 73 Fed. Reg. 71,858 (2008). Current regulations require those designated for testing to report to a collection site, which for JCCCC staff is "usually a location such as a physician's office, a county hospital laboratory, a laboratory collection facility, an urgent care clinic, or an occupational medicine clinic." Defs' Nagel Decl., ¶ 10. Employees, other than those suspected of tampering with their sample, are then provided with an enclosed stall within which to provide their sample, and do so without direct visual observation. *Id.* at ¶ 11. Further, the HHS Guidelines still provide that samples may only be tested for specified drugs. 73 Fed. Reg. at 71,880 (HHS Guidelines Section 3.3). If a sample

---

drug testing regime.

[7] In *Von Raab*, the Court assessed HHS Mandatory Guidelines that were issued in 1988. These guidelines were subsequently revised in 1994, 1997, 1998, 2004, and in 2008. *See* 73 F.R. 71,858-01.

tests positive, an employee is afforded time to justify the result and may provide evidence that the positive test was the result of legally prescribed medication or other medical conditions. Pl.'s Opp. to Defs' Mot. Summ. J., Ex. 21, USDA, Plan for a Drug Free Workplace, at *7-8.

The testing procedures established for JCCCC employees under the HHS Mandatory Guidelines are, in all material respects, identical to those considered in *Von Raab* and *Stigile*. The plaintiff does not claim otherwise.[8] The Supreme Court concluded that random drug testing procedures extant in 1988 minimized privacy intrusions; and the D.C. Circuit similarly held that HHS drug testing regulations in effect in 1997 were minimally intrusive. This Court reaches the same conclusion as to the testing protocol that will be applied here.

> b.     *"Operational Realities" of JCCCC Employees*

The Court next evaluates whether JCCCC employees have a diminished expectation of privacy given the nature of their employment. The Supreme Court has made clear that the "operational realities of the workplace may render entirely reasonable certain work-related intrusions by supervisors and co-workers that might be viewed as unreasonable in other contexts." *Von Raab,* 489 U.S. at 671. Thus, "it is plain that certain forms of public employment may diminish privacy expectations even with respect to [] personal searches." *Id.* Courts have held, for example, that employees' "expectation of privacy is lessened [when they] occupy positions that require stringent background checks," *Stigile*, 110 F.3d at 804; *see also Von Raab,* 489 U.S. at 677; *Nat'l Treasury Emps. Union v. U.S. Customs Service,* 27 F.3d 623, 629 (D.C. Cir. 1994). Furthermore, although courts have recognized that incumbent employees'

---

[8] The plaintiff disputes that the drug testing procedures are minimally intrusive since employees do not control the testing location or its "cleanliness," and are subject to directions about washing their hands and flushing the toilet, to having testing personnel standing next to the stall and listening during urination and to evaluation for cheating. Pl.'s Opp. Mem., at 4. These aspects of the drug testing protocol do not make a material difference in the level of intrusiveness from the programs previously found by other courts to be minimally intrusive. *See, e.g., Bd. of Educ. of Indep. Sch. District No. 92 of Pottawatomie Cnty. v. Earls,* 536 U.S. 822, 832-34 (2002) (finding minimally intrusive a drug testing policy that required a drug testing monitor to listen for "normal sounds of urination" in order to guard against tampered specimens).

"privacy interests are greater than applicants," *see Transp. Inst. v. U.S. Coast Guard,* 727 F. Supp. 648, 655 (D.D.C. 1989), such privacy expectations are lessened when employees had advance notice of possible testing. *Am. Fed'n of Gov't Emps. v. Dole*, 670 F. Supp. 445, 447-48 (D.D.C. 1987); *see also Aubrey v. Sch. Bd. of Lafayette Parish*, 148 F.3d 559, 564 (5th Cir. 1998) (plaintiff had "notice that his position as a custodian was specifically designated as safety sensitive and that he would be subject to random testing. . . ."); *Kreig v. Seybold*, 427 F. Supp. 2d 842, 856 (N.D. Ind. 2006) (employees had "diminished expectation of privacy because random drug testing was one of the bargained-for provisions in the 2003-2004 CBA.").

The defendants cite five key factors for their position that JCCCC employees have a reduced expectation of privacy. First, it is an operational reality that these employees work with at-risk youth in residential settings and are responsible for the students' safety and welfare. Defs' Mem., at 18-20. Second, the JCCCC employees must help maintain and enforce a zero tolerance drug environment for the students, and this policy requires no drug use among either the students or the staff, no matter the position. *Id.* at 12-15, 18-19. Third, the JCCCCs are located in rural or remote areas and employees must therefore be able to drive students or staff to services located elsewhere, including in emergency situations. *Id*. at 22. Fourth, the JCCCC employees have voluntarily submitted to rigorous background checks before employment and undergo periodic re-investigations. *Id.* at 16. Finally, the defendants maintain that employees have been on notice of testing since 1996, when the USDA first designated them for testing; and the new NFFE-USDA Collective Bargaining Agreement provided further notice of impending drug-testing provisions. *Id.*

The plaintiff counters that not all employees who are currently designated for testing work with students; and the fact that employees must submit to background checks, standing

alone, does not imply that the employees have a lesser expectation of privacy. Pl.'s Opp. Mem., at 17-18. Further, even though the USDA regulations designating JCCCC employees for testing were first issued in 1996, they were never implemented and employees reasonably assumed that they would never be put into effect. Plaintiff also points to the employee descriptions for JCCCC jobs, which do not indicate that the positions would be subject to random drug-testing.

Taking these factors into account, the Court nonetheless holds that JCCCC employees have a diminished expectation of privacy, given the nature and context of their occupational responsibilities, the higher level of background scrutiny to which they are subject, and the fact that employees had notice that the USDA has been contemplating drug-testing since 1996.

First, JCCCC employees' occupational responsibilities are unique when compared to other USFS employees. Not only are JCCCC employees in close proximity to students and at-risk youth, but they are also charged with ensuring the safety of these students generally in a drug-free environment and in cases of emergency. Employees, for example, are responsible for administering CPR and First Aid if necessary, and receive training in those techniques within 90 days of employment. Defs' Dawson Decl., ¶ 16. A fundamental goal of the JCCCCs is to provide a constructive environment for the students that has zero tolerance for illegal drugs, and staff are expected to advance this goal. Moreover, although the plaintiff disputes the extent to which these JCCCC sites are "non-traditional office environments," *see Von Raab* 489 U.S. at 674 (detecting employees' drug use can be a "difficult task" when "it is not feasible to subject employees and their work product to the kind of day-to-day scrutiny that is the norm in more traditional environments"), it does not dispute that JCCCC staff members are located at remote locations where a large number of students live and work.

All JCCCC employees are to varying extents therefore responsible for the students' welfare and safety. Indeed, the plaintiff admits that "all JCCCC employees are likely to interact with students from time to time based on proximity." Pl.'s Opp. Mem., at 2-3. Some JCCCC employees may rarely be required to supervise or care for students but, given the centers' remote locations, all employees must nonetheless be able to respond to any emergency situation. *See* Defs' Guzik Decl., ¶ 18; Defs' Ryan Decl., ¶¶ 13-14; Defs' Kopack ¶¶ 17-18. Moreover, no matter their specific position designation, JCCCC employees may perform duties without regard to their title or predominant responsibilities. *See* Defs' Guzik Decl., ¶¶ 12-13; Defs' Ryan Decl., ¶¶ 9-10; Defs' Kopack ¶¶ 12-13; Pl.'s Marnhout Suppl. Decl., ¶ 6 ("For example, an employee at one JCCCC may occasionally volunteer to transport students while an employee in the same position at a different Center may never transport students."). This aspect of their employment provides sufficient basis for the Court to conclude that JCCCC employees have a diminished expectation of privacy given the nature and context of their employment.

Second, although the USFS has designated incumbent employees for testing, the JCCCC employees nonetheless have diminished expectations of privacy given that they are already subject to background checks. In *Stigile v. Clinton*, the D.C. Circuit upheld drug testing regulations for employees working in proximity to the President, noting that these employees' "expectation of privacy is lessened because they occupy positions that require stringent background checks." 110 F.3d 801, 804 (D.C. Cir. 1997) (upholding suspicion-less testing of employees working in the Old Executive Office Building because of concerns over the security of the President and Vice-President); *see also Von Raab*, 489 U.S. at 677. While background checks for JCCCC staff members may not be as intensive as those for high-levels executive branch employees, JCCCC employees are subject to more rigorous background checks designed

for employees that "supervise young people," than most Forest Service employees must undergo. Defs' Dawson Decl., ¶ 12 (JCCCC employees subject to a "Child Care National Agency Check with Inquires: Non Sensitive/Low Risk," and some subject to "Moderate Risk Background Investigation: Moderate Risk/Public Trust.").

Third, JCCCC employees' expectation of privacy is further diminished by the fact that these employees had sufficient notice that they could be subject to random drug testing. JCCCC staff members were first designated for testing by USDA regulations issued in 1996. Defs' Nagel Decl., ¶ 18. Although these tests were not implemented until January 2011, the USDA never renounced its intention to test employees, and even listed JCCCC employees for testing again in 2003, despite the fact that testing had not been implemented between 1996 and 2003. *See id.* at ¶¶ 18-19; USDA Drug Testing Regulation, at app. A, sec. 14. The plaintiff argues that employees lacked notice of drug testing because USFS employee position descriptions do not mention drug-testing. *See* Pl.'s Opp. to Defs' Mot. Summ. J., Exs. 9-20, 22, Job Descriptions of JCCCC Employees. According to the defendants, the position descriptions have been updated to indicate that all JCCCC positions are subject to random drug testing. Defs' Dawson Suppl. Decl., ¶ 6. That earlier position descriptions did not mention testing is not enough to override the other notifications the employees received regarding their occupational responsibilities and potential drug testing. Indeed, the plaintiff and defendants periodically discussed implementing drug testing for JCCCC employees, and there is no evidence to suggest that the USDA ever announced that it would not one day move into compliance with its own regulations. *See* Defs' Nagel Decl., ¶¶ 18-19 ("Before implementing random testing of all existing JCCCC staff employees in non-supervisory positions, the Forest Service considered entering into 'impact and implementation' bargaining with the National Federation of Federal Employees (NFFE) on this

subject under its Collective Bargaining Agreement. The Union raised objections to the designation of all JCCCC staff for random testing. Discussion of the subject continued intermittently thereafter . . . ."); *see also* Pl.'s King Decl., ¶¶ 6-9. The plaintiff's contention that JCCCC employees reasonably believed that such testing would never occur is therefore unavailing.

The JCCCC employees' had sufficient notice that random drug testing procedures were being considered and drug testing was specifically included in the most recent NFFE-USFS collective bargaining agreement. Defs' Nagel Decl., ¶ 19. Drug-testing may not have been a bargained-for provision in the agreement,[9] but the plaintiff and JCCCC employees have been aware that the USFS was serious about implementing testing and had been negotiating the terms of such testing with the union for years.

For the abovementioned reasons, the Court finds that the JCCCC employees have a diminished expectation of privacy given the nature and context of their occupation, regulations already imposed upon them, and the fact that they had constructive notice of the defendants' inclination to implement testing that had been prescribed since 1996. The constitutionality of the defendants' drug testing regime is therefore dependent on whether such testing serves a special government interest that overrides the JCCCC employees' already diminished expectation of privacy.

### 3. Governmental Interests and Special Needs

---

[9] Negotiations between the NFFE and the USFS are governed by the Federal Service Labor-Management Relations (FLRA) Act, 5 U.S.C. § 7101 *et seq*, which has been construed to preclude negotiation of drug-testing policies. The wisdom to pursue such policies resides exclusively with the federal agency as drug-testing is considered to be an internal security practice under Section 7106(a)(1) of the FLRA. *Nat'l Ass'n. of Gov't Emp., Local R14-9 Union v. U.S. Army,* No. 0-NG-1268, 30 F.L.R.A. 1083 (Jan. 27, 1988).

To justify suspicion-less drug testing of particular employees, the government must demonstrate that it has an interest that overrides the designated employees' expectations of privacy. *Vernonia*, 515 U.S. at 661. Although the Supreme Court has occasionally described the governmental interest need as 'compelling,' the Court clarified that 'compelling interest' "describes an interest that appears *important enough* to justify the particular search at hand, in light of other factors that show the search to be relatively intrusive upon a genuine expectation of privacy." *Id.* (emphasis in original). To assess whether the government has an interest important enough to justify testing, courts have balanced the nature of the agency involved and its responsibilities, the challenges of the agency's mission, public safety concerns, and the ramifications and scope of drug use by the targeted class of employees. *See generally Von Raab*, 489 U.S. 668-74.

Moreover, the court also assesses whether the government has established a "clear, direct nexus" between the employees' duties and the risk and ramifications of drug use. *Harmon*, 878 F.2d at 490. The nexus requirement, however, "is not a mechanical test, requiring the court to ask nothing more than whether the harm to be avoided is a result of the tested employee's inability to perform his job properly." *Stigile*, 110 F.3d at 805. Rather, the court must assess "the risk posed by a drug-using employee and the evil sought to be prevented by the testing." *Id.* This demands that "there be an immediate, non-attenuated connection between the employee's drug use and the danger to be avoided." *Id.* Notably, "a duty which places the employee in a position to render harm can give rise to the nexus even when the feared act by the employee would not itself be a normal part of that duty." *Id.*

The defendants assert that random drug testing of JCCCC employees is justified by the special nature of the JCCCC program. Drug use by JCCCC employees, they argue, would

frustrate the JCCCC most basic goal, which is to educate and rehabilitate at-risk youth, many of whom are prone to, or suffer from, drug use. The government additionally contends that JCCCC employees are charged with ensuring the safety of JCCCC students on-site, a responsibility that is even more significant given that employees and students are located in remote locations of the country. The plaintiff does not dispute these interests, but rather asserts that such interests cannot serve as a rationale for testing *all* JCCCC employees, even those who do have limited contact with students. The Court finds, however, that the government does have a compelling interest to ensure that all JCCCC employees are drug-free since employees are entrusted to care for JCCCC students in a residential setting in rural areas and enforce a zero-tolerance drug environment for the at-risk students, even if some employees may only be called upon to engage with students on a limited basis or in emergency situations.

        a.      *The Government's Interest in Ensuring that JCCCCs are Drug-Free*

Preventing drug use, especially among teenagers and young adults, is certainly a compelling governmental interest. In upholding random drug testing of student athletes, the Supreme Court noted in *Vernonia School District 47J v. Acton* that "[d]eterring drug use by our Nation's schoolchildren is at least as important as enhancing efficient enforcement of the Nation's laws against the importation of drugs, which was the governmental concern in *Von Raab,* or deterring drug use by engineers and trainmen, which was the governmental concern in *Skinner.*" *Vernonia*, 515 U.S. at 661 (internal citations omitted).

With respect to JCCCCs, the Court finds that the government has a compelling interest in ensuring that all employees are drug-free for at least three reasons. First, most, if not all, JCCCC employees are responsible for administering and enforcing the program's zero-tolerance drug policy, and this policy is undeniably compelling given that JCCCCs cater to troubled and

underprivileged youth who may already be prone to illegal drug use. JCCCC employees charged

with administering the drug policy are responsible for reporting possible drug violations,

inspecting students' belongings for drugs, and even counseling and mentoring students who

reach out to them. Defs' Guzik Decl., ¶¶ 4-13; Defs' Ryan Decl., ¶¶ 4-10; Defs' Kopack ¶¶ 4-

13; *see also* Pl.'s Patterson Decl., ¶ 5 (a cook, who states: "As an employee at a Civilian

Conservation Center, I have a general responsibility to administer the zero tolerance policy that

applies to students for drugs and alcohol. This merely requires me to report violations, if I see

them."). The D.C. Circuit has held, even when children are not involved, that the government has

a compelling interest in ensuring that employees responsible for counseling and rehabilitating

those suffering from drug use are not using drugs themselves. In *National Federation of Federal

Employees v. Cheney*, the D.C. Circuit upheld testing for the Army's drug and alcohol treatment

counselors, stating that "[i]t is apparent that drug counselors who themselves use illicit drugs,

like drug-using interdiction agents, may 'because of their own drug use, be unsympathetic to

their mission.'" 884 F.2d 603, 614 (1989) (citing *Von Raab*, 489 U.S. at 670). Likewise, the

government has a compelling interest to ensure that those responsible for maintaining a drug-free

environment, especially in the remote sites on which the JCCCCs are located, are not

"unsympathetic to their mission." *See Cheney,* 884 F.2d at 614.

The plaintiff counters that not all employees are responsible for administering the JCCCC

drug policy, a position that is contrary to USDA and DOL regulations. Defs' Nagel Decl., ¶ 18

(DOL Jobs Corps Instruction No. 94-21 states "All staff will be held accountable for actively

supporting and implementing the Jobs Corps Zero Tolerance policy."); USDA Drug Testing

Regulation, at app. A, sec. 14 ("Drug usage by Center staff members could result in the loss of

students' lives or injury to the students. Also, all Center staff personnel are responsible for

administering the Zero Tolerance for Drug Policy. Improper or illegal drug use is inconsistent with assisting others in becoming and remaining drug-free."). USDA regulations state that "all Center staff personnel are responsible for administering the Zero Tolerance for Drug Policy." USDA Drug Testing Regulation, at app. A, sec. 14. Uniform application of this regulation is attested to by three declarations supplied by the defendant. Defs' Guzik Decl., ¶¶ 11; Defs' Ryan Decl., ¶¶ 8; Defs' Kopack ¶¶ 11. Nevertheless, the plaintiff supplies declarations from two JCCCC purchasing agents, who state that they have no responsibility for administering the JCCCC zero-tolerance drug policy. Pl.'s Case Decl., ¶¶ 1, 7 (a JCCCC purchasing agent who states that he has "no responsibility for administering the zero tolerance policy."); Pl.'s Hamann Decl., ¶¶ 1, 8 (a JCCCC purchasing agent who states that he has "no responsibility for administering the zero tolerance policy for students."). Even assuming that plaintiff is correct and not *all* JCCCC employees must administer the JCCCC zero-tolerance policy, the proximity of all employees to at-risk students in a remote residential setting is sufficient reason for the government to take steps to ensure all employees are drug-free.

Second, in light of the remote residential setting and the vulnerabilities of the at-risk students, JCCCC employees have a unique "role model effect" on students. Their constant proximity to the students residing at the JCCCCs fosters the employees' role as impromptu counselors and mentors. *See Vernonia*, 515 U.S. at 663. In short, JCCCC employees occupy special positions of influence and control over resident students already susceptible to drug abuse. *See generally Knox Cnty. Educ. Ass'n v. Knox Cnty. Bd. of Educ.*, 158 F.3d 361, 374-75 (6th Cir. 1998) ("teachers occupy a singularly critical and unique role in our society . . . [and] occupy a position of immense direct influence . . . . Through their own conduct and daily direct interaction with children, they influence and mold the perceptions, and thoughts and values of

children."). Due to the remote residential nature of the JCCCC program, the employees' duties go beyond that of typical employees or even teachers in regular schools. *See generally Vernonia*, 515 U.S. at 664 (". . . it adds to the ever-expanding diversionary duties of schoolteachers the new function of spotting and bringing to account drug abuse, a task for which they are ill prepared, and which is not readily compatible with their vocation.").

Third, even for those JCCCC employees who have limited contact with students and do not perceive their position as responsible for enforcing the zero-tolerance drug policy against the students, they must still themselves remain drug-free and avoid bringing illegal drugs on to the JCCCC premises. Indeed, the plaintiff concedes, "all JCCCC employees are likely to interact with students from time to time based on proximity." Pl.'s Opp. Mem., at 2-3. Drug use by any JCCCC employee would pose risks of potential access to drugs and defeat the purpose of the program of maintaining a drug-free environment. This danger, when coupled with the government's interest in ensuring the safety of JCCCC students, as discussed below, provides a compelling interest that overrides the employees' expectation of privacy.

b.     *The Government's Interest in Ensuring Safety at JCCCCs*

In addition to the government's interest in ensuring that JCCCCs remain drug-free, the government also has an interest in ensuring that those entrusted for the safety and well-being of JCCCC students are not impaired by drug use. The defendants argue that many, if not most, JCCCC staff members transport students to and from the sites, and that some employees train students in dangerous vocational skills. The plaintiff disputes the number of employees who are responsible for transporting students, training students in vocational skills, and the likelihood that staff members would be responsible for the safety of students. *See* Pl.'s Opp. Mem., at 11-14. Regardless, of the specific numbers of employees regularly assigned to those tasks, it seems clear

that in emergency situations, all JCCCC staff members have responsibility of caring for students and guarding their well-being. *See* Guzik Decl., ¶ 18 ("In case of a need to evacuate the Center, all employees and all available vehicles would have to be used to evacuate the students quickly. . . .This Center was, in fact, evacuated in 2000 because of forest fires."); Ryan Decl., ¶¶ 13-14 ("Relying on employees to transport students is especially important in light of the remoteness of the Anaconda JCCCC, which is located in the Beaverhead-Deerlodge National Forest."); Kopack ¶ 18 ("In case of a need to evacuate the Center, either a school bus from the local community, or all employees and all available vehicles at the Center, would have to be used in order to evacuate the students quickly."). The risk that employees could be impaired by drug-use in such situations, particularly when a large number of children are entrusted to the government's care, is certainly one that the government has an interest in preventing.

The plaintiff cites *Transportation Institute v. U.S. Coast Guard* for the proposition that the mere possibility that employees fail their job responsibilities is not enough to justify drug testing for the entire JCCCC staff. 727 F. Supp. 648 (D.D.C. 1989). In *Coast Guard*, the court struck down the Coast Guard's policy of drug-testing all employees aboard commercial vessels, stating that "a drug-related blunder by a wiper or cook could, through a chain of ensuing circumstances, lead to an emergency situation that is a threat to public safety. However, the chain of causation between the misconduct of a cook or wiper and injury is considerably more attenuated than that found persuasive for drug-related blunders by the air traffic controllers, pilots or guards. . . ." *Id.* at 658. The plaintiff's analogy to this case, however, is unavailing. Although the government is required to demonstrate a sufficient nexus between the potential harm and the government's interest, "[t]he nexus requirement is not a mechanical test, requiring the court to ask nothing more than whether the harm to be avoided is a result of the tested

employee's inability to perform his job properly." *Stigile*, 110 F.3d at 805. Rather, the court must assess "the risk posed by a drug-using employee and the evil sought to be prevented by the testing" and a sufficient nexus exists "even when the feared act by the employee would not itself be a normal part of that duty." *Id.*

In the instant case, the prospect that emergency situations could arise that would require assistance even from employees whose designated duty limits interaction with students, is quite real given that JCCCC locations are located in remote parts of the country, *see, e.g.,* Guzik Decl., ¶ 18 ("In case of a need to evacuate the Center, all employees and all available vehicles would have to be used to evacuate the students quickly. . . .This Center was, in fact, evacuated in 2000 because of forest fires."), and if JCCCC employees were unable to safeguard students, even if not within their daily responsibilities, it could lead to tragic consequences. By establishing vocational boarding schools for at-risk youth in remote parts of the country, the government has taken responsibility for the security and well-being of students entrusted to their care. There are "few governmental interests more important to a community than that of insuring the safety and security of its children while they are entrusted to the care of teachers and administrators." *Knox*, 158 F.3d at 374-75. It may be true that some JCCCC employees are rarely called upon to perform CPR, transport students, or safeguard students in emergency situations. Nevertheless, given the centers' remote locations across the country, the JCCCC employees are collectively responsible for their welfare. If these employees were impaired by drug use when an emergency situation arose on a JCCCC site, their inability to safeguard the students at a moment's notice is an evil that government has a compelling interest in preventing.

The plaintiff also argues that the government's asserted interest in testing all JCCCC employees is undercut by the fact that the USFS has not designated non-federal JCCCC workers,

contract employees who also work on JCCCC sites, for testing. The defendants note that many

private contractors have independent contractual relationships with the U.S. Department of

Labor, not with the USFS or the USDA. Defs' Dawson Suppl. Decl., ¶ 8. Even if the USFS or

USDA sought to test private contractors, they do not have the ability to do so given existing

agreements. *Id.* at ¶ 9. Regardless, however, the government need not wait to address a problem

until it is able to address all contributing factors of that problem. *See Stigile*, 110 F.3d at 807

("What the [the government] does with other groups cannot control a Fourth Amendment

challenge [to drug testing] . . . . We cannot require the government to attack all aspects of a

problem before we will uphold its right to act against a single aspect."). The government's

position that testing JCCCC employees is a compelling interest is therefore not undercut by the

government's inability to test all individuals working on JCCCC facilities.

### 4. Governmental Interests Outweigh the Fourth Amendment Interests of JCCCC Employees

Based upon the Court's findings that all JCCCC employees must help maintain a drug-

free environment for JCCCC students, their role as counselors, educators and adult supervisors to

youth prone to drug use, and the employees' responsibilities in maintaining a safe environment

for residential students located in remote parts of the country, the Court concludes that the

government has a compelling interest in testing these employees to ensure that they do not

compromise the Jobs Corps' overall educational program and do not put students at risk.

The plaintiff argues that the USDA's drug testing policy is not directed toward any

governmental interest, but is merely "symbolic" to "display[] its commitment to the struggle

against drug abuse." Pl.'s Opp. Mem., at 14-15 (quoting *Chandler,* 520 U.S. at 321-22). As

explained above, this is not the case. If the plaintiff were correct that the government's interest

was merely a symbolic stand against drug use, the Court would not hesitate to find that the

USDA's drug testing program must fall on Fourth Amendment grounds. It is "obvious that this justification is unacceptable; that the impairment of individual liberties cannot be the means of making a point; that symbolism, even symbolism for so worthy a cause as the abolition of unlawful drugs, cannot validate an otherwise unreasonable search." *Von Raab*, 489 U.S. at 687 (Scalia, J., dissenting). The defendants' interests in testing JCCCC employees are not merely symbolic, but are directed toward maintaining the effectiveness of the JCCCC program and ensuring the safety of students located in remote rural sites across the country. This rationale overrides the employees' expectation of privacy, which is already diminished considering the nature of their employment and the regulations already imposed upon them. Therefore, the Court holds that defendants' designation of JCCCC employees for random drug testing does not violate the Fourth Amendment; and the defendants' motion for summary judgment is GRANTED.

### C. PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Having considered and granted the defendants' motion for summary judgment, the court next evaluates the plaintiff's motion for preliminary injunction.

To warrant injunctive relief, the plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council*, 129 S.Ct. 365, 374 (2008); *Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011); *Jackson v. District of Columbia*, 692 F. Supp. 2d 5, 7 (D.D.C. 2010). A preliminary injunction is an extraordinary form of interim relief, however, and "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quotation and citation omitted). In meeting the requisite burden for injunctive relief, "it is particularly important for the movant to demonstrate a

likelihood of success on the merits." *Konarski v. Donovan*, No. 10-cv-1733, 2011 WL 383995, at *2 (D.D.C. Feb. 7, 2011); s*ee also Taylor v. Resolution Trust Corp.,* 56 F.3d 1497, 1507 (D.C. Cir. 1995) (finding that given the inadequacy of the plaintiff's prospects for success on the merits, there may be no showing of irreparable injury that would entitle him to injunctive relief). Without a "substantial indication" of the plaintiff's likelihood of success on the merits, "there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review." *Elite Entm't, Inc. v. Reshammiya*, 2008 U.S. Dist. LEXIS 31580, at *5 (D.D.C. Apr. 18, 2008) (citing *Am. Bankers Ass'n v. Nat'l Credit Union Admin.,* 38 F. Supp. 2d 114, 140 (D.D.C. 1999)).

  The Court holds that random drug testing of JCCCC employees does not violate the Fourth Amendment. The plaintiff therefore cannot demonstrate a likelihood of success on the merits. Plaintiff's motion for a preliminary injunction is therefore DENIED.

## III. CONCLUSION

  For the reasons stated above, while the plaintiff sufficiently pleaded its challenge to the USDA's random drug testing program to withstand the defendants' motion to dismiss for failure to state a claim, the Court holds on the merits that the defendants' designation of all JCCCC employees does not violate these employees' Fourth Amendment rights. The defendants' motion for summary judgment is GRANTED, and the plaintiff's motion for a preliminary injunction is DENIED.

**Dated: April 6, 2011**

/s/ *Beryl A. Howell*

BERYL A. HOWELL
United States District Judge